**Brendley L. DIXON, Plaintiff,**

**v.**

**Michael J. ASTRUE,[1] Commissioner of Social Security, Defendant.**

**No. C06–0065.**

United States District Court,
N.D. Iowa,
Cedar Rapids Division.

Feb. 14, 2007.

---

1. This case was filed originally against Jo Anne B. Barnhart, who was at that time Commissioner of the Social Security Administration (SSA). On February 12, 2007, Michael J. Astrue became Commissioner of the SSA, and he hereby is substituted as the defendant in this action. *See* Fed.R.Civ.P. 25(d)(1).

Jeffrey P. Berg, Cedar Rapids, IA, Thomas A. Krause, West Des Moines, IA, for Plaintiff.

Lawrence D. Kudej, U.S. Attorney's Office, Cedar Rapids, IA, for Defendant.

### ORDER

JARVEY, United States Magistrate Judge.

This matter comes before the court pursuant to briefs on the merits of this application for disability insurance benefits. On September 7, 2006, the parties consented this matter to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) (docket number 9). The final decision of the Commissioner of Social Security is reversed and this matter is remanded for an award of benefits.

### I. PROCEDURAL BACKGROUND

Plaintiff Brendly Dixon applied for Supplemental Security Income benefits on December 1, 2003, alleging an inability to work since October 29, 2003 (Tr. 59–61). Ms. Dixon's application was originally denied on January 15, 2004 (Tr. 36–39), and denied again on reconsideration (Tr. 50–31). On July 23, 2004, Ms. Dixon filed a Request for Hearing by an Administrative Law Judge ("ALJ") (Tr. 54). A hearing before ALJ George Gaffaney was held on July 15, 2005 (Tr. 251–272). On September 22, 2005, the ALJ issued a decision

unfavorable to Ms. Dixon (Tr. 12–23). The Appeals Council denied Ms. Dixon's request for review on April 8, 2006 (Tr. 5–7). This action for judicial review was filed on May 24, 2006 (docket number 3).

### II. FACTUAL BACKGROUND [2]

Ms. Dixon presented to the emergency room on October 30, 2003, complaining of chest and back pain (Tr. 150). A CT scan revealed a "type 2 aortic dissection" (Tr. 150). The actual radiology report referred to it as a "[l]arge type B thoracic aorta dissection as described above" (Tr. 170). Drs. Ersin Atay and James Levett, both cardiologists, were notified of Ms. Dixon's condition (Tr. 150).

Dr. Atay saw Ms. Dixon in the emergency room on October 30, 2003 (Tr. 148–49). Dr. Atay's notes state that Ms. Dixon's blood pressure on admission was 205/125, and currently was 139/86 (Tr. 148). Dr. Atay reviewed a CT scan of Ms. Dixon's chest, which revealed an extensive dissection of the descending aorta beginning just beyond the left subclavian and extending past the renal arteries (Tr. 148, 149).

On October 30, 2003, Ms. Dixon was also seen by Dr. Levett (Tr. 146–46). Dr. Levett's notes state that Ms. Dixon "will be admitted for medical management for which is generally successful in cases of Type B aortic dissection. She has no evidence of visceral ischemia or neurologic problems. She will be managed with an intensive blood pressure control and will be placed in Intensive Care Unit." (Tr. 147).

On November 1 and 2, 2003, Ms. Dixon was seen by Dr. Keith J. Kopec, at which time the plan was to treat her aortic dis-

---

**2.** Ms. Dixon's primary argument is that the ALJ's finding that she did not meet the criteria for listed impairment § 4.10 is not supported by substantial evidence in the record.

The court agrees. Thus, the factual background will recite only the medical evidence relating to Ms. Dixon's listed impairment.

section and hypertension conservatively with medical therapy (Tr. 144, 145).

On November 3, 2003, Ms. Dixon was seen by Dr. Fadi Y. Yacoub, M.D., on referral from her cardiologist, Dr. Atay, for assistance in managing her blood pressure (Tr. 142–43). Dr. Yacoub's notes state that Ms. Dixon "presented on October 30, 2003, with grade B dissecting thoracic and abdominal aneurysm" who "currently is relatively pain-free and doing well although blood pressure continues to be quite problematic." (Tr. 142). Dr. Yacoub recommended that Ms. Dixon "not to have strenuous activity for at least 6 months or so." (Tr. 143).

A November 4, 2003 CT scan of Ms. Dixon's chest suggested "progressive thrombus formation in the distal descending thoracic aorta." (Tr. 158).

On November 28, 2003, Ms. Dixon was again seen by Dr. Yacoub. (Tr. 139–140). Dr. Yacoub's notes of this visit state that Ms. Dixon's "blood pressure was initially somewhat difficult to control although ultimately after requiring multiple medication [sic] her blood pressure has been acceptable." (Tr. 139). Dr. Yacoub further noted that he did not see the need for Ms. Dixon to see him on a regular basis unless requested by Dr. Atay (Tr. 139).

A November 30, 2003 chest CT suggested "progressive thrombus formation in the distal descending thoracic aorta" (Tr. 155).

A December 3, 2003 letter from Dr. Atay to Dr. Yacoub states, in pertinent part: "[Ms. Dixon] has no new complaints. She denies chest pain or shortness of breath. She feels a little fatigued, however. She has very mild back discomfort on occasion." (Tr. 202). Dr. Atay noted that Ms. Dixon's hypertension "seems to be coming under good control." (Tr. 202).

A March 17, 2004 Chest CT scan found: The false lumen is larger than the true lumen at the level of the azygous arch, it

currently measures 3.4 × 3.2 cm at this level compared to 2.0 × 2.8 cm on the study 10/30/03 and this compares with 2.3 × 3.2 cm when measured at the same level on the more recent prior study of 11/04/03 ... The size of the false lumen at the level of the azygous vein arch in the chest shows progressive increase over the previous two CT's.

(Tr. 184, 190, 231).

A March 30, 2004 letter from Dr. Levett to Dr. Yacoub states:

Although Mrs. Dixon remains asymptomatic, I am somewhat concerned about the fact that the false lumen has increased in size over the last few months. I have discussed this with her and have advised her that I would like her to be evaluated by Dr. Thoralk Sundt at the Mayo Clinic to get his opinion regarding management.

(Tr. 192).

On April 28, 2004, Dr. Atay wrote a letter regarding Ms. Dixon's condition, which stated, in pertinent part:

[Ms. Dixon] has a descending thoracic aortic dissection and also has significant hypertension. Currently she is being managed medically, but consideration is being given to referring her to the Mayo Clinic for possible high-risk thoracic surgery.... I would recommend that she not participate in Promise Jobs for at least one year (until May 2005) at which time she will be reevaluated.

(Tr. 201).

Ms. Dixon was evaluated at the Mayo Clinic in September 2004 (Tr. 215–225). Dr. Costopoulos' notes of his September 17, 2004 examination of Ms. Dixon state that "Ms. Dixon notes occasional chest pains now which are sharp and only last for one or two seconds." (Tr. 218). Dr. Costopoulos further noted that the size of the true and false lumens is unchanged

compared to the prior study from May 17, 2004 (Tr. 218). Dr. Costopoulos' notes also state: "Although she notes occasional chest pains, these are not persistent or daily. It is unclear if these are actually related to her dissection or if they are chest wall pains or some other discomfort." (Tr. 219).

Dr. Sundt's notes of his September 30, 2004 assessment of Ms. Dixon state "[b]etween her November CT and a scan done in September of this year, she has had significant enlargement of the aorta with dimension going from about 34 mm to 43 mm at the level of the carina." (Tr. 216). Dr. Sundt characterized this as a "significant expansion over the course of a year." (Tr. 216).

A February 8, 2005 follow-up chest CT scan, performed at the Mayo Clinic, demonstrated "no significant change" in the descending thoracic aorta compared to September 30, 2004 (Tr. 224, 225).

## II. CONCLUSIONS OF LAW

### A. Scope of Review

In order for the court to affirm the ALJ's findings of fact, those findings must be supported by substantial evidence appearing in the record as a whole. *See Locher v. Sullivan,* 968 F.2d 725, 727 (8th Cir.1992); *Cruse v. Bowen,* 867 F.2d 1183, 1184 (8th Cir.1989). Substantial evidence is more than a mere scintilla. It means relevant evidence a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Cruse,* 867 F.2d at 1184; *Taylor v. Bowen,* 805 F.2d 329, 331 (8th Cir.1986). The court must take into account evidence that fairly detracts from the ALJ's findings. *Cruse,* 867 F.2d at 1184; *Hall v. Bowen,* 830 F.2d 906, 911 (8th Cir.1987). Substantial evidence requires "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclu-sions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Cruse,* 867 F.2d at 1184 (quoting *Consolo v. Fed. Mar. Comm'n,* 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966)). The court must consider the weight of the evidence appearing in the record and apply a balancing test to contradictory evidence. *Gunnels v. Bowen,* 867 F.2d 1121, 1124 (8th Cir.1989); *Gavin v. Heckler,* 811 F.2d 1195, 1199 (8th Cir.1987).

### B. ALJ's Disability Determination

Determining whether a claimant is disabled involves a five-step evaluation. *See* 20 C.F.R. § 404.1520(a)-(f); *Bowen v. Yuckert,* 482 U.S. 137, 140, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987).

The five steps are:

(1) If the claimant is engaged in substantial gainful activity, disability benefits are denied.

(2) If the claimant is not engaged in substantial gainful activity, her medical condition is evaluated to determine whether her impairment, or combination of impairments, is medically severe. If the impairment is not severe, benefits are denied.

(3) If the impairment is severe, it is compared with the listed impairments the Secretary acknowledges as precluding substantial gainful activity. If the impairment is equivalent to one of the listed impairments, the claimant is disabled.

(4) If there is no conclusive determination of severe impairment, then the Secretary determines whether the claimant is prevented from performing the work she performed in the past. If the claimant is able to perform her previous work, she is not disabled.

(5) If the claimant cannot do her previous work, the Secretary must determine whether she is able to perform other work in the national economy given her age, education, and work experience.

*Trenary v. Bowen,* 898 F.2d 1361, 1364 n. 3 (8th Cir.1990) (citing *Yuckert,* 482 U.S. at 140–42, 107 S.Ct. 2287); 20 C.F.R. § 404.1520(a)-(f).

■ "To establish a disability claim, the claimant bears the initial burden of proof to show that he is unable to perform his past relevant work." *Frankl v. Shalala,* 47 F.3d 935, 937 (8th Cir.1995) (citing *Reed v. Sullivan,* 988 F.2d 812, 815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the physical residual functional capacity (RFC) to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors such as age, education and work experience. *Id.*

Under the first step of the analysis, the ALJ found that Ms. Dixon had not engaged in substantial gainful activity since October 29, 2003 (Tr. 22). At the second step, the ALJ determined that Ms. Dixon had the following severe impairments: descending aortic dissection, Type B, and hypertension (Tr. 22). At the third step, the ALJ determined that Ms. Dixon does not have an impairment or combination of impairments listed in nor medically equal to one of the listed impairments (Tr. 22). At the fourth step, the ALJ determined that Ms. Dixon did not retain the residual function to perform her past relevant work as a production assembler, tray worker, or fast food restaurant cashier (Tr. 22). At the fifth step, the ALJ determined that, when considering Ms. Dixon's age, education, previous work experience, and residual functional capacity, jobs existed in significant numbers in the national economy that she could perform, i.e., addresser, final assembler, and charge account clerk (Tr. 23). Therefore, the ALJ determined that Ms. Dixon was not disabled (Tr. 23).

### C. Listed Impairment

As set forth in 20 C.F.R. Ch. III Pt. 404, Subpt. P, App. 1 § 4.10, a claimant meets the listing for "Aneurysm of aorta or major branches, due to any cause" if the aneurysm is "demonstrated by an appropriate imaging technique" with "acute or chronic dissection not controlled by prescribed medical or surgical treatment." Per 20 C.F.R. Pt. 404, Subpt. P, App. 1, Note § 4.00H6, an aneurysm has "dissection not controlled by prescribed treatment" when the claimant has persistence of chest pain due to progression of the dissection, an increase in the size of the aneurysm, or compression of one or more branches of the aorta supplying the heart, kidneys, brain, or other organs.

Ms. Dixon argues that the medical evidence clearly establishes an aortic dissection which had increased in size. In support of her argument, Ms. Dixon points to a March 17, 2004 CT scan which showed an increase in the size of the false lumen from approximately 2.0 by 2.8 centimeters to approximately 3.4 by 3.2 centimeters. An October 30, 2003 CT scan had first revealed the Type B aortic dissection. A September 17, 2004 chest x-ray revealed a "tortuous" descending thoracic aorta with prominence of the aortic arch measuring approximately 4.5 centimeters in diameter. Also at this time, Dr. Sundt discussed with Ms. Dixon, as part of a referral evaluation at the Mayo Clinic, his concern that changes noted on the CT scan represented a significant expansion over the course of the year. Dr. Sundt's notes state:

The patient's CT scan here once again measures about 43 mm in maximum diameter at the level of the carina. I

discussed with the patient and her sister the indications for surgery and the concern that this represents a significant expansion over the course of a year.

Ms. Dixon notes that while the listings require "progression," there is no requirement that the dissection increase every time it is measured. In addition, Ms. Dixon argues that the medical records reveal that she continued to experience chest pain. Ms. Dixon contends that, at a minimum, this matter should be remanded so that the ALJ can demonstrate that it actually considered Listing § 4.10 and decide whether she is presumptively disabled.

The Commissioner argues the ALJ properly determined that Ms. Dixon did not meet Listing § 4.10 because her aortic dissection is controlled with medical treatment. In support of its argument, the Commissioner relies on the September 7, 2004 CT scan, which showed that the size of the aneurysm was unchanged from the previous scan. Also, on September 17, 2004, Ms. Dixon reported only occasional and brief chest pains, not persistent chest pain. On April 18, 2005, Ms. Dixon denied chest pain.

In deciding that Ms. Dixon's severe impairment of "descending aortic dissection, Type B" did not meet a listed impairment, the ALJ stated:

> After considering all of the claimant's impairments individually and in combination, the Administrative Law Judge concludes the combined clinical findings and other evidence of record does not establish the impairments reach the level of severity prescribed by the Listing of Impairments in Appendix 1, Subpart P, Social Security Regulations No. 4. Since the claimant shows no evidence of an impairment that meets or equals the

criteria of a listed impairment or of a combination of impairments equivalent in severity to a listed impairment, disability cannot be established on the medical facts alone (20 C.F.R. §§ 404.1520(d) and 416.920(d)).

(Tr. 17).

■ The ALJ's analysis in deciding that Ms. Dixon did not meet listed impairment § 4.10 is lacking, to say the least. Why the ALJ would fail to even mention listing § 4. 10, after Ms. Dixon's attorney specifically advanced this argument at the hearing is inexplicable. The medical evidence, i.e., repeated CT scans, demonstrates that Ms. Dixon's aortic dissection had, in fact, increased in size from when she was initially diagnosed in October 2003. Due to this increase, her treating cardiologists referred her to the Mayo Clinic for further evaluation. The doctors at the Mayo Clinic similarly expressed concern regarding the progression of the dissection. In sum, the ALJ's conclusion that Ms. Dixon did not meet listed impairment § 4.10 is not supported by substantial evidence in the record as a whole.[3]

Under these circumstances, the court finds that reversal for an award of benefits is proper. *Gavin v. Heckler,* 811 F.2d 1195, 1201–02 (8th Cir.1987); *Beeler v. Bowen,* 833 F.2d 124, 127 (8th Cir.1987) (although there was no shift in the burden to the Secretary, reversal of denial of benefits was proper where "the total record overwhelmingly supports a finding of disability."); *Stephens v. Secretary of Health, Educ., & Welfare,* 603 F.2d 36, 42 (8th Cir.1979) (reversal of denial of benefits is justified where no substantial evidence exists to support a finding that the claimant is not disabled). If a remand for "further

---

**3.** Because the court finds that Ms. Dixon meets listing § 4.10, it will not consider Ms. Dixon's alternative arguments, i.e., whether the ALJ properly analyzed the medical opin-

ions, and whether the ALJ fully and fairly developed the medical record regarding Ms. Dixon's work-related limitations.

hearings would merely delay receipt of benefits, an order granting benefits is appropriate." *Parsons v. Heckler,* 739 F.2d 1334, 1341 (8th Cir.1984).

Upon the foregoing,

IT IS ORDERED that the determination of the ALJ is reversed and this matter is remanded for an award of benefits.